DONALD W. COLAW, Plaintiff-Appellant, *v.* UNIVERSITY CIVIL SERVICE MERIT BOARD OF THE UNIVERSITY CIVIL SERVICE SYSTEM *et al.*, Defendants-Appellees.

Fourth District   No. 12737

Opinion filed December 24, 1975.

BARRY, J., dissenting.

Livingston, Barger, Brandt, Slater & Schroeder, of Bloomington (Fred B. Moore, of counsel), for appellant.

James J. Costello, Timothy O. Madigan, and Warren H. Glockner, all of Urbana, for appellees.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Plaintiff Donald Colaw was discharged from his employment as broadcast engineer at the University of Illinois following a hearing and decision by the University Civil Service Merit Board. Plaintiff sought administrative review of the Merit Board decision in the Circuit Court of Champaign County. The court affirmed the decision of the Merit Board, as supported by additional findings of fact, and plaintiff appeals.

Plaintiff's discharge resulted from a dispute concerning work assignments of broadcast engineers at a WILL television transmitter station located near Monticello in Piatt County, Illinois, some 30 miles from the Champaign-Urbana campus studios. One engineer was assigned to operate the transmitting station equipment on each shift. The engineers' union, the International Brotherhood of Electrical Workers, Local 702, wanted the University to furnish transportation from the studio to the transmitter site.

When plaintiff was assigned to work at the transmitter on February 1, 1971, he reported instead for work at the campus studio and insisted on being furnished transportation to the transmitter site; his supervisor refused. Plaintiff was then given a 3-day suspension and instructed to report to the transmitter on February 4. On that date plaintiff again reported to the studio and was again refused transportation. After offering plaintiff the alternative of switching assignments with another engineer, the University sent plaintiff a notice of discharge. Plaintiff requested a hearing, and the Hearing Board convened by the Merit Board

found that plaintiff "refused to do work assigned" on February 1 and 4 in that "he failed to report to his assigned duty station" at the WILL transmitter. These findings were supplemented by additional findings of facts as follows:

Plaintiff had been an employee of the University for 18 years without evidence of suspension or reprimand until he was given a disciplinary suspension for 3 days on February 1, 1971. Plaintiff appeared for work at 6:30 a.m. on both February 1 and February 4, 1971, at the studio in Urbana, stating that he was ready to work and would work at the transmitter in Piatt County only if the University provided him with transportation. On February 4, 1971, plaintiff and Gene Crowell, the union steward, were in the offices of William R. Bensyl, and "Mr. Bensyl stated that Mr. Colaw must either report to work at the transmitter station in Piatt County as directed or switch shifts with some other employee or be discharged. Mr. Colaw and Mr. Crowell left Mr. Bensyl's office abruptly, claiming that switching with another employee was in violation of the contract and that they were being threatened and intimidated." Plaintiff did go to the Piatt County transmitter on February 4, 1971, and talked with the man on duty there, and he was at the transmitter at 6:30 a.m. on February 5, 1971, and shortly thereafter was directed to shut down and leave. Plaintiff had not previously given his employer any notice whether he would report for work on February 5, 1971, at the transmitter. The schedule of shifts for the television employees had been recently changed so that the selection of working hours would not assure a concurrent selection of place of employment. A grievance concerning transportation and travel time expense for work at the transmitter was pending in the name of the local union for Joe Dickens signed by Gene Crowell and plaintiff. This grievance had not been decided prior to the time in question.

The Merit Board confirmed these findings of its Hearing Board and found that the evidence taken at the hearing sustained the charges of the University against plaintiff and established just cause for discharge.

In his complaint for judicial review of the Merit Board decision, plaintiff alleged that the decision was not supported by the evidence and asked for reinstatement. After hearing arguments of counsel, the circuit court remanded the cause to the Merit Board, directing it to make additional findings of fact without hearing additional evidence. The court specified that the Merit Board should determine: (1) whether the offer found to have been made by Mr. Bensyl was expressly or impliedly to remain open for consideration until 6:30 a.m. February 5, 1971; (2) whether any other similar offer was made by University officials; (3) if so,

whether any such offer was to remain open for a similar time; and (4) whether plaintiff rejected such offer or offers prior to 6:30 a.m. February 5, 1971.

The Merit Board then made the following additional findings of fact:

"A. [T]he statement by Mr. Bensyl did not constitute an offer, express or implied, to remain open for any period of time in the future and that said statement by Mr. Bensyl, in fact, was not an offer to change or alter the past terms and conditions of employment and the employment agreements that existed prior to Feb. 4, 1971 and was, in fact, a re-statement of the alternatives available to all employees similary situated; and that no offer was made by any University of Illinois official that expressly or impliedly offered Donald W. Colaw the alternative of not reporting to work at his duty station on February 4, 1971.

B. That William R. Bensyl and the University of Illinois did make offers to Donald W. Colaw on February 4, 1971, to immediately accept or reject the conditions and terms of his employment as they existed prior to the disciplinary suspension of February 1, 1971 and Donald W. Colaw expressly and impliedly rejected any such offers on February 4, 1971.

C. At the close of the meeting on February 4, 1971, between Donald W. Colaw, Gene Crowell and William R. Bensyl when Donald W. Colaw left the office of William R. Bensyl, there existed no express of implied offer of employment from the employer to the employee that was conditioned upon the right of said employee to accept or reject at a later time or date; and, that any offer expressly or impliedly made by the University of Illinois officials at any meeting with Donald W. Colaw on February 4, 1971, was in fact rejected by Donald W. Colaw immediately on February 4, 1971."

Two issues are presented on appeal: (1) Could the trial court properly remand to the Merit Board for additional findings of fact without hearing additional evidence; (2) Were the findings of fact of the Hearing Board and the decision of the Merit Board, that the University had just cause for discharging plaintiff, supported by the record?

■■ Considering first whether the remand procedure was proper, the University argues that plaintiff waived this issue by not objecting to the remand order in the trial court, and cannot now raise the question for the first time on appeal. In *Boston & Main R.R. Co. v. United States*, 358 U.S. 68, 3 L. Ed. 2d 34, 79 S. Ct. 107 (1958), the court held that a remand order was interlocutory in nature, and that an appeal therefrom was premature. Since we may review all questions of law presented by the record (*Gibbs*

*v. Orlandi*, 27 Ill. 2d 368, 189 N.E.2d 233 (1963)), the question of the correctness of the remand order is properly before this court.

In *Heap v. University Civil Service Merit Board*, 83 Ill. App. 2d 350, 227 N.E.2d 560 (3d Dist. 1967), the discharge provision of the university civil service system act (Ill. Rev Stat. 1965, ch. 24½, par. 38b14) was construed to place decision-making power in the Merit Board which in turn *may* appoint a hearing board to assist by taking evidence and making findings of fact. These findings are subject to approval or disapproval by the Merit Board.

The Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, par. 275(b)) authorizes the circuit court "to make any order that it deems proper for the amendment, completion or filing of the record of proceedings * * *." The power of the circuit court to remand is discretionary. (*Sanderson v. De Kalb County Zoning Board of Appeals*, 24 Ill. App. 3d 107, 320 N.E.2d 54 (2d Dist. 1974).) Here the circuit court apparently concluded that additional findings were required to enable it to review the Merit Board decision. In 2 Am. Jur. 2d *Administrative Law* §765 (1962), it is stated:

> "[T]he court may or will remand for further proceedings * * * in order that some defect in the record may be supplied by taking further evidence, clarifying ambiguous findings, or making additional findings."

A remand procedure similar to the one used here was approved by the United States Supreme Court in *Boston & Main R.R. v. United States*, 358 U.S. 68, 3 L.Ed.2d 34, 79 S.Ct. 107 (1958).

Where, as here, the circuit court deems the findings of fact of the Merit Board to be inadequate, but concludes that the record is sufficient to enable the Merit Board to make additional findings, the court, in its discretion, may remand with instructions to make findings on necessary questions without hearing additional evidence.

■■ Next we must consider whether the evidence supported the findings and decision. In reviewing actions of administrative agencies, neither this court nor the trial court may reweigh the evidence, or make an independent determination of the facts. The findings of the agency on questions of fact are prima facie correct, and may be set aside only if they are against the manifest weight of the evidence. (*Harrison v. Civil Service Com.*, 1 Ill. 2d 137, 115 N.E.2d 521 (1953).) Nevertheless, since an administrative decision must be supported by substantial evidence the courts have the right to review all questions of law and fact presented by the record. *Gibbs v. Orlandi*, 27 Ill. 2d 368, 189 N.E.2d 233 (1963).

The university civil service system act (Ill. Rev. Stat. 1973, ch. 24½, par. 38b14) provides that no employee shall be discharged "except for just

cause." Section 36d(10) (par. 38b3(10)) of the same statute authorizes the University to make rules for removals, and, accordingly, Rule 11.5(c) of the Rules of the University Civil Service System of Illinois provides that causes justifying discharge include "all those listed as cause for suspension if they become recurring offenses." Rule 11.4(b) includes as a cause justifying suspension "refusal to do work assigned." The University contends that, therefore, plaintiff's refusals to do work assigned on February 1 and 4 were recurring offenses and amounted to just cause for discharge.

Clearly plaintiff refused to do work assigned on February 1 when he did not report to the WILL transmitter as required, and it is not disputed that his conduct on that day was cause for suspension. Whether the occurrence on February 4 amounted to a "recurring" refusal to do work assigned, sufficient to be just cause for discharge, is the crucial question, and requires an examination of the evidence concerning the events of February 4, as well as events leading up to February 4.

The employment contract between the University and plaintiff's union contained a provision for shift selection by employees at the beginning of each semester in the order of their seniority. Earlier grievance proceedings by broadcast engineer employees had resulted in rulings that radio engineers could not select television department shifts and vice versa, and that employees could select only the hours to be worked, not the location of their work. Shortly before February 1, a list for shift selection was posted by the management which included two shifts for the 6:30 a.m. to 2:30 p.m. time period. Plaintiff, who was second in seniority, selected one, and Kolter, who was lower in seniority, selected the other. Thereafter, plaintiff was assigned to the Piatt County transmitter, and Kolter was assigned to work at the campus studio for the same time period.

At that time a grievance was pending in which another engineer was contesting his assignment to the Piatt County transmitter during the first semester under a slightly different shift selection procedure. Plaintiff, as assistant union steward, had co-signed this grievance. The engineers' employment contract provided that travel would be furnished an employee "sent out of Champaign-Urbana on a temporary assignment," and the employees were contending, among other things, that this included one-semester assignments at the transmitter. Thus plaintiff's refusal to report to the transmitter without being provided transportation was related to the unresolved dispute between the engineers and the management of the television broadcasting department.

Plaintiff's duties at the transmitter involved turning on the transmitting equipment in a particular sequence, with a 20-minute warmup time during which adjustments were made before actual broadcasting began.

The television station could not go on the air until an engineer turned on the transmitting equipment. On February 1, after plaintiff refused to provide his own transportation, his supervisor, Inman, sent another engineer to the transmitter. As a result of the late arrival of the engineer, WILL began broadcasting 3 minutes late that day without the usual warmup time.

On February 4, after plaintiff reported to the studio, Inman again sent another engineer to the transmitter, and broadcasting began at the normal time. Inman then suggested a meeting to discuss the situation. At about 8:30 a.m. the concerned parties met in the office of Bensyl, who was in charge of labor relations for nonacademic personnel. Besides Bensyl, management was represented by Inman and by Inman's supervisor, while plaintiff was accompanied by Crowell, the union stewart. All persons present testified at the hearing, and all agreed that Bensyl told plaintiff that he had two alternatives: go to work at the transmitter, or find a man willing to switch studio duty for transmitter duty; if neither happened he would be discharged. All witnesses agreed that Bensyl mentioned no time or deadline for electing an alternative, and that plaintiff did not state his acceptance or rejection of these alternatives. The meeting was terminated after Crowell responded on behalf of plaintiff that the option to switch shifts was in violation of the terms of the contract, and that Bensyl was threatening and intimidating them. Plaintiff and Crowell then jumped up and left. Both plaintiff and Crowell testified that, as they were leaving, Crowell said he wanted to talk to someone else.

Shortly after the meeting, plaintiff and Crowell went to the office of Faught, the associate director for personnel services who negotiated labor contracts for the University, where they discussed the meeting that had just occurred. Faught repeated the alternatives available to plaintiff and stated that he thought the shift-switching alternative was permissible under the contract. Crowell reiterated his opinion that, under earlier grievance rulings, employees were not allowed to select the location of their assignment.

About 10:30 a.m., after leaving Faught's office, plaintiff submitted to Inman a request for 11 days vacation to which he was entitled, but Inman refused to approve it because discharge papers were then in the process of being prepared. Inman testified that plaintiff then said he wasn't aware of a time limit for his decision on the alternatives. Inman replies that when plaintiff walked out of the meeting, it indicated to Inman that he had rejected both alternatives. Inman then told plaintiff that there was no work for him at the studio that day. Plaintiff was not asked for his keys to the transmitter, and he went home about noon. Between 4 and 5 p.m. the same day, plaintiff went to the transmitter station to ask the engineer on duty how to start the equipment since he had never had that assignment

and then left. He later returned to the studio briefly about 6:30 or 7 p.m., but did not notify Inman of any decision. On the morning of February 5, plaintiff reported to the transmitter at 6:30 a.m. and began the warming-up procedures. Plaintiff was told by Inman by telephone to shut the machinery down and return to the campus studio because he had been discharged. Upon his return to the studio, he was asked to turn in his keys, which he did. He received a notice of discharge by mail later the same day.

On appeal, plaintiff contends that certain additional findings of fact by the Merit Board were against the manifest weight of the evidence. First, he disputes that the alternatives presented by Bensyl required an immediate acceptance or rejection. Admittedly, there is no evidence that Bensyl expressly stated that one of the alternatives must be accepted at the meeting or before any specific deadline. Bensyl testified that "I indicated by the language that it was immediate. In other words, it was now." His recollection of the language used was: "You have two alternatives, and barring that, we have no choice but to discharge you." However, considering the nature of plaintiff's work, we believe the Merit Board could reasonably infer that the offer was one that plaintiff knew he must accept or reject within a very short time. Without an engineer physically present at the transmitter at 6:30 a.m., WILL must either forgo part of the warmup time or begin broadcasting late; therefore, plaintiff must have or should have known that the options proposed by Bensyl could not remain unanswered until 6:30 a.m. the next morning without interfering materially with work of the television department. Plaintiff's work was the key to the entire television operation each day.

■■ Furthermore, at 10:30 a.m., 2 hours after the meeting, plaintiff was informed by Inman that discharge papers were being prepared. This constituted actual notice that the two alternatives were not open for an indefinite period. Even then, he gave no indication that he intended to accept one of the alternatives, and in fact, by his own testimony, he made no attempt to notify Inman or any other person of authority that he had made any such decision. Considering all of these facts, we conclude the Merit Board's finding was not against the manifest weight of the evidence.

■■ Second, plaintiff disagrees with the Merit Board's finding that plaintiff expressly and impliedly rejected the alternatives offered him. Although plaintiff did not state, "I reject both alternatives," the Merit Board could take into account plaintiff's conduct. At the meeting with Bensyl, plaintiff did not repudiate Crowell's statement that the switching alternative would violate plaintiff's employment contract, and he left the first meeting abruptly without indicating approval of either alternative. He persisted in the same conduct during the subsequent interview with

Faught. Furthermore, it could be inferred that, by requesting vacation time beginning February 5, plaintiff indicated that he did not intend to accept either alternative but instead was seeking a different solution to his immediate problem. There is no evidence that, upon being told by Inman that his abrupt departure from Bensyl's office indicated a rejection of the offer, he denied or disputed that conclusion. Instead plaintiff went home and made no attempt to notify Inman or any other superior that he intended to report to the transmitter the next day. This evidence substantiates the finding that plaintiff rejected both alternatives on February 4.

■■ Plaintiff also argues that it was error to find that Bensyl's statement was not an offer to change or alter the past terms and conditions of employment that existed prior to February 4, and was, in fact, a restatement of alternatives available to all employees similarly situated. After carefully searching the record, we can find no direct evidence in support of this finding. The Merit Board apparently construed plaintiff's employment contract to permit employees to switch work locations among themselves subject to University approval. An earlier grievance decision had held that, under the contract, employees could not select the location of their work but only the hours, with the University to have the sole right to assign work locations. However, the contract did not preclude reassignment of employees by the University during the course of a semester. Therefore the switch alternative as presented to plaintiff could be construed as an offer to reassign plaintiff, subject to the consent of both plaintiff and some other employee.

Plaintiff also argues that, even if the findings were supported by the evidence, his failure to report to the transmitter on February 1 and 4 did not constitute "just cause" for dismissal, as that term has been defined by the courts, and the two incidents were not "recurring" offenses of sufficient frequency to come within the Civil Service Rules. In *Tudor v. University Civil Service Merit Board*, 131 Ill. App. 2d 907, 910, 267 N.E.2d 341 (4th Dist. 1971), the court reiterated that just cause for discharge means "some substantial shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place." The reviewing court considered "punctuality and compliance with work rules" to be essential to discipline, and accordingly affirmed discharge of a janitor for 23 unauthorized absences from work during a 2-year period and for drinking intoxicating liquor on University time.

Unlike the janitor in *Tudor*, plaintiff's position was critical to the efficiency of his department and therefore his failure to report to the transmitter on 2 days was much more detrimental to the University. In

some instances, the evidence here was susceptible to differing inferences. However, there must be something more than a mere conflict in the evidence to warrant a conclusion that a finding of fact is erroneous. *Fischer v. Industrial Com.*, 408 Ill. 115, 96 N.E.2d 478 (1951).

Considering all of the evidence and the findings of fact, we cannot say that the decision of the Merit Board was against the manifest weight of the evidence. Hence, the ruling of the circuit court is affirmed.

Affirmed.

ALLOY, P. J., concurs.

Mr. JUSTICE BARRY, dissenting:

The agreement between the Board of Trustees of the University of Illinois and Local 702, I.B.E.W., for the period July 1, 1969, to June 30, 1971, in respect to broadcasting engineers contains a provision at article VI, section 6, that "employees shall be credited with all time spent traveling to and from assignments after reporting for work." The broadcasting facilities of the University were located at or nearby the Champaign-Urbana campus in Champaign County, Illinois, except for an isolated island of ground supporting a TV transmitter station some 30 miles away in Piatt County.

For some 18 years, petitioner was employed as a broadcasting engineer by the Board of Trustees and on February 1, 1971, was second in senority at the Champaign County *campus* within the meaning of section 36i of the university civil service system act (Ill. Rev. Stat. 1973, ch. 24½, par. 38b8). He was a resident of Champaign and during his 18 years of service at the broadcasting facilities regularly reported to the campus studios and performed his assigned work without any history of reprimand, suspension or other discipline. On February 1, 1971, by reason of being second in seniority, petitioner was allowed, for the second academic semester, to select a 6:30 a.m. to 2:30 p.m. shift. Another engineer with lesser seniority was assigned by the University for work *at the campus studio* for the same shift. Petitioner, however, was assigned to the Piatt County transmitter site. On February 1, he reported to the campus studio and asked for transportation to the transmitter station to perform his assigned duties. That request resulted in a 3-day suspension "for failure to do assigned work." *Traveling to Piatt County* was apparently considered by terms of this notice as being "assigned work," although the University proposed no compensation for same.

At the time of this suspension there was already pending an unresolved grievance executed by petitioner as a union official on behalf of another employee to determine whether traveling 300 miles per week from the

campus to the transmitter, for the period of a full semester, was a part of the "work" of an employee for which he should be compensated and paid, including reimbursement for transportation, or whether the University, simply by designating that site as a station to which an employee should report for work, could require the employee to provide his own transportation on his own time, and thereby avoid the foregoing requirements of the Union contract at article VI, section 6.

At the expiration of his suspension on February 4, 1971, petitioner again reported to the campus studio and in addition to offering to be taken to the transmitter to do his assigned work, offered also, as an alternative means of alleviating his personal predicament, to take earned vacation time whereby another engineer could be temporarily assigned there. The offer was made on the expressed expectation that the pending grievance would be resolved by the time of the expiration of his vacation. It is conceded that engineers temporarily assigned to the transmitter site were entitled to transportation, and that such transportation was in fact furnished by the University to those traveling there during the interval from February 1 through February 4. Petitioner's request for vacation was immediately rejected and notice of discharge was served, it being asserted by the University that "one offense" of not reporting directly to the Piatt County Station on two separate occasions, is "just cause" for discharge, according to Board rules made pursuant to statute.

We have held on a previous occasion that while interpretations given by an administrative agency to its own rules and regulations or to applicable statutes are entitled to respectful consideration, they are not, in the manner of properly supported findings of fact, conclusive in the courts in administrative review, and that any erroneous construction of any statute or regulation by an adminstrative agency is not binding. *Heifner v. Board of Education*, 32 Ill. App. 3d 83, 335 N.E.2d 600 (3d Dist. 1975).

The Act (Ill. Rev. Stat. 1973, ch. 24½, par. 38b14) defines that "After completion of his probationary period, no employee shall be demoted, removed or discharged except for just cause * * *." In the same section, it is recited that "[i]f cause for demotion, removal or discharge is found, the employee shall be immediately separated from the service." Demotion, removal or discharge are connected by the disjunctive "or" and refer to three distinct and separate alternatives. The phrase "separation from the service," therefore, while it includes the concept of "termination of employment" is not synonymous with that phrase but expresses a broader meaning. A "demotion" necessarily implies a continuation of service in some different capacity and not a termination. Under the rule-makings powers of section 36d(10) (ch. 24½, par. 38b3(10)), the meaning of the separate alternative of "removal" is made plain by the provision that the merit board may make and publish rules for "transfers and removals" in accordance with and to execute the

provisions of section 36*l* (ch. 24½, par. 38b11). There is no language in section 36d(10) (ch. 24½, par. 38b3(10)) which expressly purports to give the merit board the power to define "just cause" for *discharge*, and if such power is by any construction determined to be implicit, it would be validly exercised only to the extent that its rule on that subject conforms with judicial interpretations of the meaning of the statutory phrase " just cause."

The courts have defined "just cause" for discharge in the context of the statute under consideration as constituting some "substantial shortcoming which renders [an employee's] continuance in office or employment in some way detrimental to discipline and efficiency of the service *and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place.*" (Emphasis added.) *Tudor v. University Civil Service Merit Board,* 131 Ill. App. 2d 907, 267 N.E.2d 341 (4th Dist. 1971).

The majority concludes that petitioner's position as broadcast engineer at the transmitter site in Piatt County was critical to the efficiency of the campus broadcasting activities, and that his failure to report there directly on two separate occasions was detrimental to the University and cause for discharge. I believe, however, that for the acts to be "substantial shortcomings" within the meaning of the law, the detriment must also be substantial, and that it is a patent exaggeration to conclude or imply that petitioner's acts in reporting to the studio rather than to the transmitter site constituted any substantial interference with respondent's broadcasting activities. On all occasions, petitioner offered to execute his duties at the transmitter; *the sole detriment involved was limited to the issue of transportation time and costs* to the transmitter site for the *limited period* until a pending grievance should be resolved. Considering that the University did provide such transportation for petitioner's replacement, and that the time within which the grievance was expected to be resolved was short, the detriment to the University was plainly trivial and not substantial.*

Moreover, to state, as the majority do, that petitioner's acts were detrimental to the discipline and efficiency of the University's broadcasting service, at most satisfied only a part of the legal test and falls short of meeting all the legal requirements for a discharge for "just cause" within the meaning of the statute. The acts complained of must also be conduct "which the law and sound public opinion recognize as good cause for his no longer occupying the position." It is not merely the adverse effect upon the University that is relevant but the entire perspective in which the acts were performed. Acts performed by

---

* A determination of the pending grievance was in fact determined on March 5, 1971.

provocation or invitation or by simple misunderstanding or other unavoidable circumstance cannot be good cause. The perspective here, as all parties admit, shows the existence of a bona fide and peaceable labor dispute as to the meaning of article VI, section 6, of the contract.

The University on the occasions of February 1 and February 4, although it willingly provided such to his substitute, refused to furnish transportation to petitioner during the period of a pending grievance because in the words of its witness, such act might jeopardize its posture in the pending grievance. In assigning petitioner, notwithstanding his seniority, to the Piatt County station, at a time when he was prosecuting the grievance pertaining to that very subject, the University chose to create a circumstance which it knew or ought to have known would pose for petitioner a parallel concern for jeopardizing the union's position. I am wholly unpersuaded on this record that either the law or sound public opinion would recognize the two separate acts of petitioner, first, in raising a bona fide question of law as to the meaning of the agreement, and second, in offering peaceably to take earned vacation time until the question should be resolved in a pending grievance, "as good cause for terminating petitioner's employment." Expanding upon the remarks of Justice Smith in *Tudor*, I would agree that the law and sound public opinion will accept that "repeated disregard of trivial regulations may change * * * mole hills to a mountain" and constitute a "substantial shortcoming" which provides "just cause for discharge." I do not agree that "two instances of any conduct listed as a cause for suspension" is the automatic equivalent of that substantial "mountain." The inquiry here is not confined to a review of the perfunctory question of whether Board definitions are met by the proof; we are required in the context of the entire record to examine also as to whether the asserted grounds for discharge satisfy all the requirements of justice. In my judgment the incidents complained of were inspired or manufactured by the University and petitioner's response was invited. I would reverse the judgment affirming the Merit Board's order of discharge, and order petitioner's reinstatement.