THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY, Respondent-Appellant, *v.* ILLINOIS COMMERCE COMMISSION *et al.*, Petitioners-Appellees.

First District (4th Division)   No. 76-856

Opinion filed December 15, 1977.

James R. Gannon and Robert A. Subkowsky, both of Lewis, Overbeck & Furman, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago, and George J. Witous and Ralph L. Rehnquist, both of Oak Lawn (Hercules F. Bolos, Rodney C. Howard, and Mary C. Ubatuba, Assistant Attorneys General, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The respondent, the Baltimore and Ohio Terminal Railroad Company (Railroad), appeals from an order of the trial court affirming an order of the Illinois Commerce Commission establishing a grade crossing. We find that the Commission failed to consider what effect the interference with the railroad operation will have on the public convenience in general and remand for additional testimony as needed and further consideration.

On March 12, 1973, the villages of Chicago Ridge and Oak Lawn filed a petition with the Illinois Commerce Commission requesting the establishment of a grade crossing over the two main tracks and the three side tracks of the railroad at Austin Avenue at approximately 105th Street. This point is about halfway between Ridgeland Avenue (6400 West) and Central Avenue (5600 West), the two main north-south arterial roadways bordering the area. The railroad's tracks also cross both of those arterial roads and, of course, there are grade crossings at each of these locations, but there is none between the two except for a private crossing at 103rd Street and Oxford, near Ridgeland Avenue. This crossing can be used by emergency vehicles.

The Baltimore and Ohio Chicago Terminal Railroad tracks extend in a northwest-southeast direction through the two villages. A main line of the Norfolk and Western Railway Company extends in a northeast-southwest direction through the two villages. These tracks intersect with the respondent's tracks a short distance east of Ridgeland Avenue. There are no grade crossings of the Norfolk and Western tracks between the Baltimore and Ohio Chicago Terminal tracks and Central Avenue to the east, a distance of approximately one mile.

The Commission found that:

(1) the triangular area of land formed by Central Avenue on the east, the Norfolk and Western tracks on the northwest and the Baltimore and Ohio Chicago Terminal's tracks on the southwest has no means of access for the general public to the west, to the north or to the south except via Central Avenue.

(2) that this area is being rapidly and substantially developed by both single-family and multifamily dwellings.

(3) that in order to drive out of this area in a north, south or west direction traffic must use Central Avenue, a heavily used arterial street, and then travel north or south to the existing grade crossings of Central Avenue with either the respondent's tracks or those of the Norfolk and Western Railroad.

(4) that the extension of Austin Avenue and its use by vehicular traffic would permit the police and fire department vehicles of the two villages to reach the triangular area in an expeditious manner (there was, however, no finding that they do not reach it in an expeditious manner now); it would permit school vehicles to transport children more efficiently; it would alleviate the necessity of the residents of the triangular area to use Central Avenue, and that, accordingly, the extension of Austin Avenue would promote the safety, health and welfare of the citizens of the area.

(5) the Commission found that the railroad's contentions that the Austin Avenue Crossing would interfere with its operations; that the tracks in this area are used for interchange with the Norfolk and Western Railway Company, as well as for setouts and pickups, for one train to pass another, and for switching the bulk of a train when industrial switching is performed in the area; that the crossing could be blocked by westbound trains waiting for the Norfolk and Western interlock and by eastbound trains waiting for a favorable signal indication so that they may proceed without blocking crossings to the east; that while the trains could be cut, this would take additional time; and that if the crossing were to be installed there would be approximately 80 additional train cuts requested per month are all supported by the evidence. It also found that 60 train movements per day are anticipated over the crossing. It, however, while finding that the crossing at Austin would be injurious to the railroad operations to some extent, dismissed this fact with the observation that the railroad is a public utility deriving its franchise from the State and by accepting the same, agrees to submit to all burdens, conditions, and regulations imposed by the State with reference to its tracks and intersections by highways.

The railroad filed a petition for rehearing contending both that no crossing was needed and that if one should be built, it would be better to open the one at 103rd and Oxford Avenue, a location which would not interfere with railroad operations. These contentions were rejected by the Commission which found the Oxford Avenue crossing to be less suitable because of financial reasons, because it would serve a smaller area, because the Oxford crossing would be more hazardous and because it and the Ridgeland Avenue crossing could be blocked at the same time causing a large traffic problem.

Because of the result we reach, it will not be necessary for this court to

set forth in any detail the evidence presented to the Commission. That testimony pertinent to the conclusions we draw will be developed in our discussion of the issues.

## I.

■■■ The Commission brushed off any consideration of the effect the grade crossing might have on railroad operations with the observation that the railroad is a public utility deriving its franchise from the State and by accepting the same, agrees to submit to all burdens, conditions and regulations imposed by the State with reference to its tracks and intersections by highways. This is, of course, the law. (*Chicago & Northwestern Ry. Co. v. Illinois Commerce Com.* (1927), 326 Ill. 625, 158 N.E. 376.) Nevertheless, the fact that the railroad is subject to regulation does not mean that the Commission need not consider the concerns of the railroad. In an application for a grade crossing, the primary and controlling interest to be considered is the public interest (*Yowell v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1935), 360 Ill. 272, 195 N.E. 667.) The convenience and necessity required to support an order of the Commission are those of the public and not of the individual or a number of individuals. (*Choate v. Commerce Com.* (1923), 309 Ill. 248, 141 N.E. 12; *Yowell v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1935), 360 Ill. 272, 195 N.E. 667.) Accordingly, since the issue was raised, it was incumbent upon the Commission to determine whether any benefit to the few townspeople would be offset by an even greater detriment to the public elsewhere because of an interruption in train service, or delays in service, or higher costs or even in increased blocking of roads elsewhere. Likewise, the Commission must also consider the damage to the railroad itself. (See *Choate v. Commerce Com.* (1923), 309 Ill. 248, 141 N.E. 12; *Public Service Com. v. Fort Wayne Union Ry. Co.* (1953), 232 Ind. 82, 111 N.E.2d 719.) As pointed out in the latter case at 232 Ind. 82, 98, 111 N.E.2d 726, 727:

> "It seems too obvious to require elaboration that the construction of this project as planned is not necessarily reasonable and lawful even though traffic is heavy in the vicinity, and the new construction will help to eliminate congested traffic and expedite the smoother flow thereof. It might well be that the elimination of traffic congestion and the expedition of the smoother flow of traffic would promote the safety and serve the convenience of the general public, yet the establishment of the project as planned might at the same time be arbitrary, capricious, confiscatory, unreasonable and unlawful. Although the primary interest to be considered is the public interest, fairness to those regulated is a factor in the general welfare."

It will not benefit the public good if the railroad is forced to curtail its

operation or go out of business because of the interference with its operations. See *Choate v. Commerce Com.* (1923), 309 Ill. 248, 141 N.E. 12, where the court reversed an order granting a business a franchise because it could destroy the railroad.

We cannot say, on the evidence which was presented to the Commission, that it is clear that the public interest does not prohibit the establishment of the Austin crossing. Without detailing the evidence presented, suffice it to say that there was testimony that:

1. The railroad currently used the tracks for switching and holding standing cars because with no grade crossings over the tracks for almost a mile there were no crossing vehicles. There is no other area available for "set out" uses.

2. The railroad is a short haul carrier. It cannot schedule the movement of cars but must move them as received. It is often necessary to hold cars on a track for several hours until they are picked up. Obviously, to hold these cars for several hours without blocking a crossing it is necessary to have an uninterrupted stretch of track. As the Austin Avenue area is the only such uninterrupted track it is vital to railroad operations.

3. While it is possible to "cut" such trains so that some cars would be located on each side of a crossing, this takes time.

4. By Federal law, a train crew can work only for twelve hours. At the end of 12 hours a crew must stop its train wherever it is and go off duty. Tracks without grade crossings such as at Austin are readily available for passing operations. A train may be parked to allow another train whose crew is close to the expiration of its 12-hour period to proceed with maximum efficiency to its destination.

5. It is necessary to have an area where priority trains carrying perishables can pass other trains. Twenty % to 30% of the traffic using the railroad carries perishable commodities which must be given priority. Again the Austin Avenue area is the area used to allow these trains to pass others.

6. Chicago Ridge is the only place on the line where a through train could pass slower trains without difficulty.

7. The additional "cuts" which would be required if the grade crossing were to be installed would create additional delays and many through trains would not be able to complete their trip during a crew's 12-hour tour of duty. One of the reasons additional cuts would be required is because by statute a train may not block a crossing for more than ten minutes.

8. At present a train "lays back," *i.e.*, moves slowly through the Austin Avenue area while awaiting a signal for a clear track ahead. It only proceeds at full speed ahead when the track over the next three grade crossings is clear. By this means it can avoid blocking those crossings any longer than is necessary.

9. A delay in the Austin area would result in a piling up of trains which would result in the blockage of the Central, 111th and 123rd Street crossings.

10. A crossing at Austin would complicate all moves on the track to a point there would be great trouble handling any westbound train.

11. The track has been denoted a "strategic line" by the State Department of Transportation. If the plan is put into effect, the line will be even more heavily used than it currently is.

Finally, we cannot help noting that counsel for Chicago Ridge himself stated that the railroad could not afford the crossing.

We are not suggesting that the evidence set forth above must be believed or that it necessarily controls. It is not for us in the first instance to weigh the evidence and reach a conclusion; that is for the Commission to do (*Schussler v. Illinois Commerce Com.* (1951), 410 Ill. 289, 102 N.E.2d 101; *Colaw v. University Civil Service Merit Board* (1975), 37 Ill. App. 3d 857, 341 N.E.2d 719), and we cannot review findings where in fact the essential findings have not been made. We do conclude, as did the Indiana court in *Fort Wayne Union Ry. Co.* that the findings failed to concern themselves with the real question presented. For that reason, the judgment cannot stand and the case must be remanded for further proceedings.

## II.

While, in light of the conclusion we have drawn as to the Commission's failure to consider a principal issue, we have not reviewed the record to determine if the Commission's findings were supported by the substantial weight of the evidence, we do, however, note certain disturbing points which hopefully will be clarified by the Commission upon remand.

■■ The Commission found that a vehicular traffic study indicated that, based upon full development of the area surrounding the crossing, an estimated 12,000 vehicles per day would use the proposed Austin Avenue crossing. However, as the witness making the study testified, in making the study he in no way considered the effect the anticipated 60 train movements per day over the proposed crossing would have on the projected traffic pattern, nor did he consider what effect the blocking of the crossing many times a day for long periods of time due to the train traffic and the necessity of cutting trains would have thereon. Yet it is obviously a relevant consideration in any determination of how convenient the proposed crossing would in fact be. On remand, these factors plus the effect the neighboring highways have on traffic patterns should be considered in determining just how useful a crossing at Austin would in reality be. If in fact most of the traffic goes away from that area or would not use Austin, then the crossing could not be justified. Furthermore, while the Commission pointed out that it was possible to

block both the Ridgeland Avenue and Oxford Avenue crossings for 20-minute periods (although in fact the testimony shows it is not likely to happen absent malfunction or human error), no consideration was given to the admitted fact that the Central and Austin crossings would be simultaneously closed far more often under the proposed crossing. Although this fact is hardly controlling, some consideration should have been given to it and its effect upon the utility of any Austin crossing to ease the flow of traffic. If the Austin crossing is to be blocked for long periods of time each day, and, indeed, if the number of blockings at both Austin and Central were increased because of the necessity to cut trains, it is difficult to see how the establishment of the Austin crossing would further increase the public safety and convenience.

As stated earlier, the Commission's order cannot be affirmed because of the Commission's failure to consider the effect the crossing would have upon public convenience. Accordingly, the judgment of the trial court affirming the Commission's order is reversed and the case is remanded to the Commission for further consideration not inconsistent with this opinion.

Reversed and remanded.

DIERINGER, P. J., and JOHNSON, J., concur.