ALTON WATER CO. *et al.*, Plaintiffs-Appellants, *v.* ILLINOIS COMMERCE COMMISSION, Defendant-Appellee.

Fourth District   No. 14773

Opinion filed June 9, 1978.

554

Chapman & Cutler and Isham, Lincoln & Beale, both of Chicago (John N. Vander Vries, Daniel J. Kucera, Christine Hehmeyer Rosso, and David J. Rosso, of counsel), for appellants.

William J. Scott, Attorney General, of Chicago (Hercules F. Bolos, Mary C. Ubatuba, James E. Weging, and Thomas J. Swabowski, Assistant Attorneys General, and Douglas P. Karp, law clerk, of counsel), for appellee.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

Plaintiffs, water and sewer companies doing business in this State, appeal the circuit court of Sangamon County's affirmance of an order of defendant Illinois Commerce Commission. That order required all public utilities subject to the Commission's jurisdiction other than railroads and public utilities providing services in the city of Chicago to develop, construct, operate and maintain a State-Wide One-Call Notice System which would aid excavators working in areas near to utility underground facilities. Plaintiffs also appeal the Commission's denial of their request to be excluded from the operation of the order.

On review, plaintiffs contend that: (1) the Commission had no authority to enter the order; (2) the findings of the Commission were contrary to the manifest weight of the evidence; (3) the order imposes an unreasonable and confiscatory burden upon them; and (4) the Commission's findings of fact were insufficient. Plaintiffs also attack the procedures leading up to the order and the order itself as being fundamentally unfair.

Under the Commission's order, subject utilities would be required to participate in a system organized in such a way that by the making of a single telephone call to one location, an excavator could alert all subject utilities having underground facilities in an area where he intended to excavate, of that intent. Those utilities would, in turn, be able to alert the excavator to the presence of underground facilities belonging to the utilities in order to prevent damage to such facilities. These types of damage are known as "hits" or "dig-ins." The order further directed the utilities to elect a committee "to create an entity" to develop and operate the system. A not-for-profit corporation was suggested as an appropriate entity and the parties agree that such a corporation has been formed.

■■ The Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 1 *et seq.*) grants the Commission broad powers. Section 49 of the Act authorizes the Commission to determine "just, reasonable, [and] safe * * * practices, * * * service[s] or methods to be observed" by public utilities and to fix the same by "order, decision, rule or regulation" (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 49). Section 57 in part provides:

> "The Commission shall have power, after a hearing and upon its own motion, or upon complaint, by general or special orders, rules or regulations, or otherwise, to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, and the public, and to this end to prescribe, among other things, the installation, use, maintenance and operation of appropriate safety or other devices or applicances * * * to establish uniform or other standards of equipment, and *to require the performance of any other act* which the health or safety of its employees, passengers, customers or the public may demand." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 61.)

We deem participation in the one-call notice system to be a method of providing service which the Commission may require under section 49 and an act which may be required under section 57 if "the health or safety" of the public so demands.

Plaintiffs contend that the order was improper because the Commission would have no power to regulate a corporation or other entity formed to operate the one-call notice system. However, the Commission is not organizing that entity nor is it requiring the formation of any particular type of entity. It is merely ordering that the utilities cooperate to provide a one-call notice service. Clearly the Commission can order utilities to furnish services that require the utilities to do business with unregulated entities. We see no practical difference between such an order and the one under consideration in this case.

Furthermore, with the Commission regulating the utilities forming the one-call system, it will have power to indirectly control the operation of the system.

The Commission made findings that a State-Wide One-Call Notice System "is reasonable, in the public interest, and is necessary thereto" and that such a system "will materially reduce the frequency of damage by excavators." Plaintiffs contend that these findings are contrary to the manifest weight of the evidence.

The primary evidence presented in support of these findings was a study concerning the incidences of gas utility "dig-ins" in Illinois covering the period from October 1, 1971, to April 30, 1973. The study was presented by a subcommittee of the Commission formed to study the feasibility and implementation of a notice system. The utilities included in the study served 98% of all Illinois gas customers. The study contained figures as to the total number of excavations occurring during the period, the number of excavations in which notice to the utility had been given, and the number of "hits" occurring as a result of these excavations. In summary, it indicated that a "hit" occurred in roughly one out of every two excavations for which no notice was given, but occurred in roughly one out of every 60 excavations where the utility was notified.

The chairman of the subcommittee which presented the study testified that the subcommittee had no reason to believe that the data contained in the study was not representative of the incidences of "dig-ins" as to other utilities. This conclusion was based on the fact that various utilities were represented by membership in the subcommittee and that information supporting a conclusion other than that reached by the subcommittee had been requested but no such information had been received. No statistics concerning the occurrences of "dig-ins" as to other utilities were available to the sub-committee.

The evidence before the Commission bearing upon the effect of a one-call system on the facilities of water utilities varied. A representative for a utility serving Champaign-Urbana stated that he did not think that in his area the number of "dig-ins" that would be prevented would be worth the cost involved. Similar testimony came from a water utility representative of utilities in western and southern Illinois. These witnesses reasoned that the advantages from such a system for water utilities would be less than those for other utilities such as the suppliers of gas because (1) underground water facilities are buried deeper than those of electric, gas and telephone utilities, and are made primarily of cast iron, thus making them less subject to damage, (2) damage to water mains is less dangerous than damage to underground facilities of other utilities, and (3) underground water facilities are generally located below street right-of-

ways and are marked by hydrants, valve boxes and manholes, thus making them less likely to be the subject of damage by excavators.

On the other hand, the figures testified to by the representative from the utilities of southern and western Illinois indicated that "hits" occurred in one out of six excavations when no notice was given but in only one out of every 24 when notice was given. Considering this evidence and the report of the subcommittee we can not determine that the Commission's findings that the one-call system was reasonably necessary in the public interest and such that it would reduce the damage to the utilities' facilities to be contrary to the manifest weight of the evidence. Ill. Rev. Stat. 1975, ch. 111 2/3, par. 72.

In arguing that the Commission's finding that the cost of the system is "reasonable" is contrary to the manifest weight of the evidence, plaintiffs rely on *Schussler v. Illinois Commerce Com.* (1951), 410 Ill. 289, 102 N.E.2d 101, and *Baltimore & Ohio Chicago Terminal R.R. Co. v. Illinois Commerce Com.* (1977), 55 Ill. App. 3d 915, 370 N.E.2d 1266. In *Schussler,* the court upheld a commission decision that denied a petition to require a railroad to furnish suburban passenger service where the evidence showed that the cost of operation would exceed revenue even though much evidence was presented in favor of granting the petition. In *Baltimore & Ohio Chicago Terminal,* the court overturned a commission order requiring establishment of a grade crossing for failure of the commission to find whether the benefits to the users of the crossing would exceed the damages to other members of the public and the costs to the railroad.

Plaintiffs argue that the evidence here conclusively shows that their costs would exceed any benefits derived. They point to the testimony of both the representative of the Champaign-Urbana utility and the representative of utilities in southern and western Illinois. Testimony was presented that the Cairo Water Company's "dig-in" costs have been only $500 per year and that their costs, should they be required to join the notice system, would be large because there is no other company nearby with whom a terminal for receiving messages could be shared. In the southern part of the State most of the utilities of all kinds are municipally owned or cooperatives and are not regulated by the Commission.

■■ ■ In considering the reasonableness of the costs, however, the Commission properly considered benefits to the public as well as to the companies. Moreover, no final determination as to the costs for a particular company has been made. The order requires that the costs must be shared in such a way as to make them reasonable as to the small companies. If costs as finally determined prove to be confiscatory as to a particular utility, that entity should be permitted to withdraw.

Plaintiffs further assert that the Commission findings as to their motion to be excluded from the one-call system were insufficient. The basis of their petition were their claims that (1) they operated in areas where other utilities were often furnished by entities not subject to Commission regulation, (2) their facilities were less vulnerable to "hits," (3) less danger resulted from hits of water facilities, (4) their costs of repair from hits would be small, and (5) many of them are so small that they lack financial resources or personnel to effectively participate. However, the general findings of necessity, effectiveness of the system and reasonableness were stated in terms to make them applicable to water utilities. The findings further stated that the system would have to be organized in such a way as to give consideration to small utilities in order to minimize their costs. Accordingly, we deem the findings to be sufficient.

■■ The resolution which initiated the Commission's consideration of a one-call notice system provided "a State-Wide One-Call Notice System would provide a ready and convenient means for excavators to provide notice of excavation to utilities." Plaintiffs argue that this evidences the Commission's prejudgment on the question of the need for a one-call notice system and that the procedures thereafter were fundamentally unfair.

In *Federal Trade Com. v. Cement Institute* (1948), 333 U.S. 683, 92 L. Ed. 1010, 68 S. Ct. 793, cement companies contended that the FTC had prejudged the issue of permitting a multiple basing point system in the selling of cement because, prior to proceedings on the matter, Commission members had indicated that the system was violative of the Sherman Act. On this issue, the United States Supreme Court stated:

"[T]he fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities." 333 U.S. 683, 701, 92 L. Ed. 1010, 1034, 68 S. Ct. 793, 803.

Similarly, plaintiffs here participated in the hearings conducted by the Commission and were given the opportunity to present evidence, cross-examine witnesses and present arguments. We deem the Commission's resolution simply to have been the mechanism used to initiate proceedings concerning a one-call notice system.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MILLS and REARDON, JJ., concur.