The Honorable Niles **JACKSON, Petitioner,**

**v.**

**The Honorable John MALEY, Presiding Judge over the Petition of Wendell Smith Alleging Irregularities in the General Judicial Election Held November 6, 1990, for Judicial Office No. 3, Oklahoma County, Oklahoma; The Honorable Lance Ward, Secretary of**

---

the State Election Board, State of Oklahoma; The Honorable Marti L. Hayes, Election Board Secretary, Oklahoma County; and Wendell Smith, Contestee of the November 6, 1990 General Judicial Election, Respondents.

No. 76774.

Supreme Court of Oklahoma.

Feb. 4, 1991.

As Corrected Feb. 8 and 25, 1991.

Rehearing Denied Feb. 25, 1991.

Kenneth R. Nance and Thomas J. Daniel IV, Oklahoma City, for petitioner.

Lana Jeanne Tyree and Phyllis L. Walta, Oklahoma City, for respondent Smith.

Robert H. Henry, Atty. Gen., and Dan M. Peters, Asst. Atty. Gen., Oklahoma City, for respondent Ward.

Dick A. Blakeley, Asst. Dist. Atty., Tulsa, for respondent Hayes.

LAVENDER, Justice.

Petitioner, Niles Jackson, the announced winner at the general election held on November 6, 1990, for office three, district judge, seventh judicial district, Oklahoma County, requests us to assume original jurisdiction and issue certain writs of mandamus. He asks us to issue a writ of mandamus to Respondent, the Honorable John Maley, trial judge over a petition alleging irregularities filed by Respondent, Wendell Smith (announced loser of the election), directing him to deny the petition. The trial judge in ruling on Smith's petition held it could not be determined with mathematical certainty which candidate was entitled to a certificate of election and he entered judgment ordering a new election. Jackson also asks for writs of mandamus to the Oklahoma State and County Election Boards directing them to issue him a certificate of election to the contested office. The secretaries of the election boards, Lance Ward and Marti L. Hayes, respectively, have been named as Respondents.[1] Recognizing the great public importance of election matters we assume original jurisdiction under OKLA. CONST. art. VII, § 4

and cases such as *Keltch v. Alfalfa County Election Board,* 737 P.2d 908, 909 (Okla. 1987) and *Helm v. State Election Board,* 589 P.2d 224, 226 (Okla.1979). We further vacate the judgment of the trial judge.

After the election Jackson was the announced winner by 157 votes according to the official canvass generated by the Oklahoma County Election Board.[2] He had 68,004 votes to Smith's 67,847. Smith attempted to impeach the official canvass by showing there were a sufficient number of irregularities so that it was impossible to determine with mathematical certainty which candidate was entitled to be issued a certificate of election.[3] The trial judge ruled he carried his burden to so show. We hold the trial court erred.

■ The judgment of the trial judge is broken down into three parts. The first part finds certain irregularities which the trial judge ruled established it could not be determined with mathematical certainty which candidate was entitled to a certificate of election. Such determination in an irregularity matter is required by statute. 26 O.S.Supp.1990, § 8–120(2). The burden of establishing same is upon the contestant, here Smith. *Groves v. Bumgarner,* 662 P.2d 307, 308 (Okla.1983); *Helm v. State Election Board, supra,* 589 P.2d at 227; *Hembree v. City of Stilwell,* 597 P.2d 1218, 1220 (Okla.1979). These irregulari-

1. Respondents Ward and Hayes support the position of Petitioner in this original action. They request, as does he, that we assume original jurisdiction and rule Respondent Smith failed to establish sufficient irregularities to void the election. They, thus, take the position the trial judge was in error when he so ruled and in ordering a new election be held.

2. The canvass of precinct returns is generated by a county election board from the precinct returns of the county. 26 O.S.1981, § 7–136. It is used by the Oklahoma State Election Board to certify the results of the election for all state officers and questions. *Id.*

3. Respondent Smith alternatively requested in his irregularity petition that he be certified as the winner of the election. The trial judge did not order such relief nor does Smith press said claim for relief here. Therefore, our opinion is limited to a determination of whether sufficient irregularities were shown to exist to support the

trial court's decision to void the election result and order a new election. Also not before us in this case is a trial court ruling on a petition for a recount filed by Respondent Smith. The trial court ruled in such regard a recount could not take place because the ballots, after the election, had not been preserved in the manner and by the officers prescribed by law such that it was not possible to determine (1) whether the ballots were the identical ones cast by the voters and (2) that the ballots had not been exposed to the reach of unauthorized persons such as to afford a reasonable opportunity of their having been changed or tampered with. Under 26 O.S. 1981, § 8–112 such determinations are required to be made before a recount may take place and if they cannot be made by the trial judge no recount takes place. *Andrews v. State ex rel. Eskew,* 618 P.2d 398, 400–401 (Okla.1980). No review of that ruling has been sought here as it was in *Henderson v. Maley, et al.,* 806 P.2d 626 (Okla.1991), a case arising out of the same election.

ties found by the trial court are as follows. (1) 87 persons who voted at the election in Oklahoma County were shown to not be registered to vote by the records of the Oklahoma County Election Board; (2) 77 ballots cast at the election were not read by the electronic scanning (counting) devices used by Oklahoma County to count the ballots;[4] (3) 66 more votes were cast than persons signing the official precinct poll books, challenged voter and absentee voter affidavits; and (4) one person voted at two different precincts.

The trial judge next found a series of irregularities he said "cast serious doubt as concerns the mathematical certainty of the election...." These were as follows. (1) 587 spoiled ballots were issued without proper affidavits;[5] (2) at precinct 225 there was a lack of control over the ballots and voters were not allowed to place ballots in ballot boxes of any type, but were instructed to leave them on a table in open view; (3) there were numerous head errors pertaining to the electronic scanners; (4) there were numerous problems with the electronic scanners; (5) there were several electronic scanning tapes (precinct vote total tapes) which did not have a zero tape attached; (6) numerous accounting errors on the precinct ballot accounting forms exist which means all ballots were not accounted for by precinct officials; and (7) there was a lack of proper marking equipment, to wit: spe-

cialized pens which allow the scanner to properly record the vote.

The third category of irregularity concerned the trial judges "questioning" of whether the election results were reversed, i.e. that Smith really won by 157 votes, rather than Jackson. However, no finding was made by him the results *were* so reversed and as we shall demonstrate the evidence in this record *does not* support such a conclusion. Instead, the evidence unequivocally refutes it. We shall discuss the various irregularities found by the trial court and their impact, if any, on this election.

■ In order for an irregularity to establish it is impossible to determine with mathematical certainty which candidate was the winner a contestant must make a *prima facie* case of mathematical uncertainty. *See Helm, supra,* 589 P.2d at 228. Only then does it become incumbent on the announced winner to go forward with the evidence to establish he achieved victory by a mathematical certainty. *Id.* This is so because a contestant in Smith's position must present at least enough evidence to impeach the correctness of the precinct returns, as embodied in the official canvass of the county election board, which are *prima facie* evidence themselves of the correctness of the vote. To so impeach the precinct returns a contestant must, at

4. Oklahoma County uses a paper (really cardboard) ballot in its elections in conjunction with an electronic counting device. After the ballot is filled in by a voter it is inserted into the device which scans it and automatically reads and registers the choices made by the voter. Essentially, the electronic device takes the place of human counters. At least as early as 1979 we noted the use of these or similar type machines in Tulsa County in the case of *Helm v. State Election Board,* 589 P.2d 224, 229 (Okla.1979). It appears these types of devices have been authorized for use on a statewide basis after a unitary system of election administration has been implemented by the Secretary of the State Election Board. *See* 26 O.S.Supp.1989, § 21–101.

5. The executed judgment of the trial judge *does not* contain a finding concerning the 587 spoiled ballots. However, a letter ruling of the trial judge dated November 27, 1990 contains the finding. Our review of these two documents

lead us to conclude the omission of the finding from the executed judgment we have been provided was one of mere oversight. On the letter ruling the spoiled ballot matter was listed by the trial judge *first* under the category of irregularities he thought cast serious doubt as to the mathematical certainty of the vote. In all there were seven such irregularities listed. On the executed judgment there are six irregularities listed which correspond to the final six irregularities on the letter ruling. The six irregularities are placed on the executed judgment after alphabetical headings *F through K*. In the paragraph directly below listed irregularity K the trial judge makes his finding that said irregularities, "*E* through K" (emphasis added), are the ones casting serious doubt as to the mathematical certainty. Obviously, paragraph *E* was meant to contain the 587 spoiled ballot issue, the first issue contained in the letter ruling. Even if we are wrong in such conclusion we will assume for the purpose of our opinion the issue is before us and we will decide it.

least, make a showing either *illegal* votes were cast or votes were cast by legal voters that should have been counted, but were not, or were counted incorrectly, *in sufficient numbers*, to eliminate his opponent's margin of victory. *See Hembree, supra*, 597 P.2d at 1220; *see also Helm, supra*, 589 P.2d at 227–228. He could also show some other irregularity, such as legal voters, again in sufficient numbers, were denied the right to vote. He must make such a showing because courts indulge every presumption in favor of the validity of an election and, where possible, that validity will be sustained. *Keltch, supra*, 737 P.2d at 911. Mere probabilities will not suffice to carry this initial burden. *Groves, supra*, 662 P.2d at 308. From our review of this record we find only two of the trial court's rulings arguably meeting the *prima facie* standard, but the number of votes involved are wholly insufficient to eliminate Jackson's margin of victory. Thus, the trial court erred in his determination to order a new election.

■ Oklahoma County has over 280 precincts within its boundaries. During the general election over 172,000 votes were cast in the county of which over 135,000 were cast in this race. To vote at a precinct the person presenting himself on the day of the election must be a registered voter. To determine if one is registered precinct officials are provided with a precinct registry (poll book) which is compiled by the county election board and provided to the precincts. 26 O.S.Supp.1990, § 7–102.1 and § 7–114. Voters in the registry are required to sign it when they present themselves to vote. 26 O.S.Supp. 1990, § 7–117. Persons *not* listed in the registry, but who present themselves to

vote may still cast a ballot if they present a voter identification card and sign an affidavit swearing that he/she is a registered voter of the precinct and no absentee ballot has been cast. 26 O.S.Supp.1990, § 7–116. The first irregularity found by the trial court concerns these latter voters. He ruled 87 of these voters, at the time of hearing, were not shown to be registered in the records of the county election board. Clearly our case law supports the view that the vote of an unregistered voter is illegal and should be discarded. *Baggett v. State Election Board*, 501 P.2d 817 (Okla.1972). Our review of the record bears out this finding of the trial court, but the 87 votes alone are insufficient in numbers to meet the *prima facie* case for Jackson's margin of victory was 157 votes according to the precinct returns.[6]

■ The trial court also found one person voted at two different precincts. The record bears out this finding. Documentary evidence was provided a person with the *exact* same name and address voted at the two precincts, apparently at one by signing a challenged voter affidavit. Although Jackson argues it simply could have been a case of two different voters with the exact same name and address (e.g. father and son) we believe a *prima facie* case was made by contestant as to the voter being the same person. No evidence was introduced by Jackson to refute the *prima facie* case and we, thus, discard the two votes cast by this individual.

The next categories of votes we will discuss concern the 587 spoiled ballot affidavits and the finding of the trial court 66 more votes were cast than signatures in the poll book, challenged voter and absentee voter affidavits. We discuss these two

---

**6.** The evidence as to the 87 unregistered voters consisted primarily of testimony of election board officials and its records. Jackson argues the evidence made clear many people register right up to the deadline before an election with one of the over 600 precinct registrars in Oklahoma County and it is not unusual for these registrations to be transmitted to the county offices weeks or even months *after* an election. He, therefore, asserts evidence limited only to records of the county board was insufficient to show the 87 people were unregistered. In his

view contestant was required to check the records of the precinct registrars to see if one or more of the 87 were, in fact, actually registered, but their registrations had simply not been transmitted to the county offices. In view of our ultimate ruling here that contestant did not prove his case in any event we need not definitively decide whether a contestant can make out a *prima facie* case involving unregistered voters by presenting *only* evidence from the county election board records. We will assume he can.

categories together because we believe both categories are similar to the extent they are matters of a directory nature insufficient to invalidate any votes in the numbers claimed by contestant.

Our case law recognizes election irregularities will not always invalidate the result of an election. Although irregularities of any kind should not be permitted by election officials "whether an irregularity or several irregularities void an election depend upon the circumstances in each particular case." *Edmondson v. State ex rel. Phelps*, 533 P.2d 604, 613 (Okla.1974). Further, we have recognized provisions of our election laws are mandatory if sought to be enforced *before an election*, but after an election they normally should be held to be directory only, unless of a character to effect an obstruction to the free and intelligent casting of the vote or the ascertainment of the result, or the provisions affect an essential element of the election or unless it is expressly declared in the statute that the particular act or its omission is essential to the validity of the election. *See Town of Grove v. Haskell*, 24 Okla. 707, 104 P. 56, 61 (1909), citing with approval *Jones v. State ex rel. Wilson*, 153 Ind. 440, 55 N.E. 229 (1899) and *Edmondson, supra* at 614–615. As to 587 spoiled ballot affidavits not being signed and 66 more votes being cast than supporting poll book signatures, challenged voter and absentee voter affidavits our view is these matters are insufficient to invalidate the election or the votes claimed because they concern only directory provisions.

■ The signing of a spoiled ballot affidavit is clearly required by our statutes when a voter somehow spoils a ballot such that a new one has to be issued. 26 O.S. 1981, § 7–122. However, § 7–122 provides no invalidating sanction for violation of the provision and the evidence here, other than the failure to sign the affidavit, provides *no* indication the *spoiled ballots* were not destroyed as required by § 7–122 or that any of the spoiled ballots were counted as valid votes at the election. Neither does the fact new ballots were issued support the conclusion, as Smith seems to assert,

that some of the ballots were voted by unregistered voters. Although this is a possibility, just as anything is a possibility, to conclude some or all of these ballots were voted by unregistered people involves nothing more than unwarranted speculation, speculation we refuse to engage in here. In fact, certain report forms from precinct officials to the county election board introduced into evidence and testimony from election officials would indicate the contrary. This evidence was to the effect that many times an individual voter spoils more than one ballot while attempting to cast a valid vote and because of either embarrassment, the hectic pace on election day or some other innocent reason the voter does not sign an affidavit.

In Oklahoma County the record shows over 9,000 spoiled ballots were involved. Although we believe the failure to obtain signatures for the issuance of almost 600 new ballots for the spoiled ones is an irregularity and violation of § 7–122 it is only in the realm of speculation (i.e. the realm of the possible) that any of the 587 instances resulted in an illegal vote being cast or counted at this election. Thus, no *prima facie* case of mathematical uncertainty was made out by Smith in regard to the spoiled ballot affidavit issue sufficient to overcome the presumption in favor of the precinct returns as correctly reporting the votes for this election.

■ The issue concerning 66 more votes being cast than signatures in the poll books, challenged voter and absentee voter affidavits, we believe, may be looked at in the same manner as the 587 spoiled ballot affidavits. Voters, before voting, are required by statute to either sign the precinct registry (poll book) [26 O.S.Supp.1990, § 7–1171], a challenged voter affidavit [26 O.S.Supp.1990, § 7–116] or, when a voter has requested an absentee ballot but has not voted it, an absentee voter affidavit [26 O.S.1981, § 7–115]. The trial court found the number of signatures on these documents was 66 less than the total votes cast in Oklahoma County. The signing of these documents is, in our view, directory only and to discard these 66 votes, as with

587 spoiled ballot affidavits, would force us to engage in nothing more than speculation that one or more of the votes was somehow tainted with illegality. We will not engage in such speculation.

In *Coffey v. Board of Commissioners of McCurtain County*, 205 Okla. 238, 237 P.2d 139, 142 (1951), we ruled absence of a poll book was immaterial when election challengers sought to examine it to determine whether unqualified electors had been allowed to vote. This was a recognition that signing the poll book, although required by statute, was directory in nature only. More recently, we made clear in *Keltch v. Alfalfa County Election Board*, *supra*, 737 P.2d at 910, signing a poll book was directory. There we held although there were four more ballots issued than signatures in the poll book (and the margin of victory was three votes) such was insufficient to void the election result.[7] These cases are dispositive of the issue of whether more votes being cast than signatures on the involved documents is sufficient to discard 66 votes. Without additional proof any of the votes were unlawful or illegal in some regard (something not shown by this record) the failure to obtain signatures cannot itself support a conclusion they were illegal. Although we do not look lightly on the election officials' apparent failure to obtain signatures for each vote cast the signature requirement being directory only is not of such a character to taint those

votes or discard them here to support Smith's *prima facie* case of mathematical uncertainty.

■ The next irregularity found by the trial court pertinent here is the finding 77 ballots were not read by the electronic scanning (counting) device used by Oklahoma County to count the ballots. In that this issue is intertwined with the trial court's findings of head errors and problems with the electronic scanning devices we will discuss these matters together.

To intelligently consider these issues it is necessary to understand the basic working of the electronic voting devices used in Oklahoma County. A voter fills out a cardboard ballot with a specialized pen[8] and inserts the ballot into the machine. The device is equipped with a scanner that reads the choices made. In certain instances the device is programmed to return or "kick back" a ballot to the voter. Some examples of when a ballot would be "kicked back" are when a *totally* blank ballot is inserted, when the ballot is not fed into the device properly or when certain portion(s) of the ballot have been ripped or torn. Each time a ballot is "kicked back" the counting device is programmed to register a not defined ballot or error. These not defined readings or "kick backs" for this election totaled over 1300. Although the supervisor of the voting machine division testified this number was highly unusual or irregular his testimony made clear

---

7. *Keltch* contains *dicta* to the effect we may have had a different view if we were faced with a situation similar to the one here (i.e. more ballots *cast* than signatures in the poll book, etc.), rather than the situation there (more ballots *issued* than signatures in a poll book). *Id.* at 909–910. To the extent *Keltch* contains such *dicta* we disapprove it here. The point of *Keltch* and the one we reiterate here is that failing to obtain a signature in a poll book is of a directory nature. Failure to obtain a *signature alone is* insufficient to taint the votes cast in excess of the signatures without some additional evidence *the votes themselves* are illegal. To rule otherwise would potentially disenfranchise legal voters on mere speculation and void a result which *does* truly reflect the will of the electorate because of an omission by election officials. Very simply, the failure to obtain signatures in 66 instances where over 172,000 votes were cast cannot overcome the presumption in favor of

the reported precinct results in the amount of 66 votes. Such a conclusion sustains our oft repeated view that every presumption in favor of the validity of an election will be indulged [*See Cooper v. Dix*, 771 P.2d 614, 617 (Okla. 1989)], and, generally, an election not clearly illegal will be upheld. *Id.* and *Keltch, supra* at 911. Without some minimal indication, not found in this record, the 66 votes were cast by illegal voters or were in some other respect invalid, we *refuse to turn the signing* of a poll book into a mandatory requirement, the omission of which results in an invalidating sanction for votes cast in excess of the number of signatures.

8. In addition to the scanner being able to "read" ballots marked with the specialized pen, the evidence disclosed a number 2 pencil and any relatively dark pen mark could also be read by the scanner, depending on its color.

*in each instance when a not defined error was registered the ballot was "kicked back" to the voter and, accordingly, an opportunity was given for the ballot to be reinserted and counted correctly.*[9] Further, if the machine again registered it as not defined it would again be "kicked back" to the voter as many times as the machine would not read it. From our review of the record, these not defined ballots or errors registered each time a ballot is returned to a voter were primarily the head errors or scanning problems referred to by the trial court.[10] Rather than indicating an irregularity or malfunction of the machine, what they truly indicate is the machine working as it was designed when a ballot cannot be read. In each instance the voter is afforded an additional opportunity to reinsert his ballot into the machine correctly to be counted or if the machine refuses to accept it after repeated attempts the voter would obviously be afforded an opportunity to obtain a new ballot to vote that can be read by the electronic scanning device. Thus, the purported head errors and scanning problems found by the trial court afford no basis to question the accuracy of the precinct returns because no evidence was presented these supposed problems resulted in any voter being denied the right to vote or that any validly marked ballot was not counted.

In contrast to the not defined ballots or errors, the 77 unread ballots out of over 170,000 cast are ones *permanently* recorded for this election as unread and are the product of pushing an override button on the machine which will allow the device to accept the ballot for deposit in what the voting machine division supervisor referred to as an out-stack area. In other words, the only way a ballot can be run through the machine and registered as permanently unread is by manual manipulation of the device through the use of the override button. Although the record contained each and every precinct where such unread ballots were recorded Smith failed to call any precinct officials in those precincts to detail the circumstances surrounding the reason for the pushing of the override button to accept the ballot as unread. In the absence of evidence that any of said ballots *should* have been registered as anything but unread we believe no basis exists to find that they should have been read because there is no indication they were properly voted ballots entitled to be counted. This is particularly so when one considers certain testimony of the voting machine supervisor.

The supervisor testified that many times during elections voters will present themselves to vote, they will sign the poll book and *insist* that precinct officials make the machine take their ballot *even though it is blank.* Remember, a totally blank ballot will not be accepted by the device, but will be returned to the voter. In other words, these 77 ballots may have merely been a form of protest by some voters who insist their ballots be counted as unread and a vote for no one. We, thus, find unpersuasive the argument these 77 unread ballots may be viewed as adding to Smith's *prima facie* case to void this election because of mathematical uncertainty.

Other irregularities found by the trial court that he indicated cast serious doubt as concerns the mathematical cer-

**9.** According to the voting machine division supervisor by definition a not defined ballot is one not recognized by the machine for a variety of reasons and *one that is returned or "kicked back" to the voter.*

**10.** To the extent the trial court's findings regarding head errors or scanning problems were meant to refer to something else besides the not defined readings, such as possibly malfunctioning of certain machines or reports concerning repairs of machines during the election, the evidence in this record is simply insufficient to sustain a finding that any machine malfunctioned in such a manner to support a conclusion that voted ballots were read incorrectly or not at all so that it would be impossible to determine with mathematical certainty who won this election. This may be the reason the trial court in his judgment only said the head errors and scanning problems "cast serious doubt as concerns the mathematical certainty of the election", rather than making a specific finding these matters were sufficient to prove it was impossible to determine with mathematical certainty who was entitled to be issued a certificate of election as required by 26 O.S.Supp.1990, § 8–120(2).

tainty of the election, as opposed to proving it is impossible to determine the winner with mathematical certainty as is required by 26 O.S.Supp.1990, § 8–120, may be dealt with as a group. These concern lack of control over the ballots at precinct 225, errors by precinct officials in the ballot accounting forms, a lack of proper marking equipment to allow the scanning device to properly record the vote and several electronic scanning tapes (precinct vote total tapes resembling adding machine tapes) did not have an initial zero tape attached to them as the rules of the State Election Board require.[11] As to all four of these irregularities there is not one shred of credible evidence in this record they resulted in any eligible voter being denied the right to vote, that ballots cast were not properly recorded or that any ballots were cast by anyone other than qualified electors. Although there is speculation in the record that it is possible such could have occurred, speculation as to mere possibilities simply does not suffice to overcome the presumption in favor of the validity of this election or the results as reported by precinct officials. As we noted earlier, we will not engage in such speculation and void this election merely because irregularities are shown. The irregularities must be shown by Smith to make it impossible to determine with mathematical certainty who is entitled to a certificate of election. *See Edmondson v. State ex rel. Phelps, supra,* 533 P.2d at 616. The irregularities noted do not so show.[12]

■ The last matter "found" by the trial court was to the effect of his *questioning* whether the *results* reported from the various precincts were somehow backwards or reversed because of a misprogramming of the electronic scanning device. The argument supporting this questioning is that because the first name on the ballot (here Smith) is apparently to be recorded on the official canvass of returns generated by the county election board in the 03 column and the first name in this race was recorded in the 04 column the results from the various precincts could have been reversed. From our review of the record the trial court and Smith misperceive the evidence. What the evidence shows, at most, was that the *names* of these two candidates on the official canvass as reported by Oklahoma County were reversed from how they appeared on the ballot, not that the *results* were reversed. It is clearly shown by review of certain totals tapes generated at three precincts *directly* from the electronic voting devices used at these precincts which were admitted into evidence, that the number of votes for each respective candidate shown on these tapes *exactly* match the number of votes recorded on the official canvass of returns generated by the county election board for said precincts. Thus, although the names on the official canvass are reversed from how they appear on the ballot and on the totals tapes *the results themselves are correctly reported* on the official canvass and nothing in this record shows otherwise. Therefore, the trial court's questioning in regard to this issue provides no basis to void this election or order a new election for the involved office.[13]

---

**11.** The zero tape is supposed to be run at the beginning of the election day before any votes are cast to show that no votes are registered on the electronic voting device scanning or counting mechanism.

**12.** Although the trial court made no specific findings concerning them Smith raises here certain irregularities which were the subject of evidence below (e.g. certain reporting forms from precinct officials to the election board secretary indicating questionable handling of voted ballots and one polling place being closed with people still in line to vote). We have reviewed all such matters and view the docu-

mentation supporting same to be somewhat ambiguous. Smith called no precinct officials to support or explain the documentation. However, even assuming the irregularities occurred Smith *wholly* failed to present *sufficient numbers* which would taint this election result.

**13.** In view of our disposition of this matter we have no occasion to rule on Jackson's assertion that certain allegations of Smith's petition alleging irregularities should have been stricken by the trial court as not being specific enough. *See generally Otjen v. Kerr,* 191 Okla. 628, 136 P.2d 411 (1942).

Generally, in the absence of fraud or corruption and in the presence of merely statutory informalities, the results of an election will not be invalidated. *See Cooper v. Dix, supra* 771 P.2d at 617. No fraud or corruption is involved here. Further, when irregularities are shown to exist, but they are not of such a character in either quality or quantity to prove the outcome of an election cannot be determined an election result will be upheld. This view is based on the rationale of the electorate in having its votes counted and, secondarily, the expense involved in a new election. Our review of the instant record convinces us there is no basis to void this election or thwart the will of the electorate as reported by the various precinct returns in Oklahoma County.

Accordingly, the decision of the trial court is VACATED. In that Respondents Ward and Hayes have supported the position of Jackson in this original action we deem it unnecessary to issue a writ of mandamus to them requiring the issuance of a certificate of election to Jackson. We assume in light of our opinion a certificate will be so issued without the requested writ.

SIMMS, HARGRAVE and SUMMERS, JJ., concur.

KAUGER, J., concurs specially.

HODGES, V.C.J., concurs in part, dissents in part.

OPALA, C.J., dissents.

DOOLIN, J., disqualified.

HODGES, Vice Chief Justice, concurring in part, dissenting in part:

Candidate Smith, the apparent loser in his bid for district judge, filed a petition in the trial court alleging irregularities which voided the election and in the alternative filed a petition for a recount.

Candidate Smith won a partial victory before the trial court who said because of irregularities in the election process he could not determine with mathematical certainty which candidate was entitled to a certificate of election and ordered a new election. Candidate Jackson, feeling aggrieved, appealed. Candidate Smith, as a victorious winner, had nothing to complain or appeal from the trial court's judgment. He was satisfied with his partial victory.

The majority opinion correctly disapproves of the trial court's decision, holding the irregularities alleged by Candidate Smith form no basis to void this election but then erroneously directs a certificate of election be issued to Candidate Jackson. I cannot agree with the later direction.

Candidate Smith has not abandoned his Petition for a Recount. With this Court's reversal of the trial court judgment, the case should be returned to the trial court to conduct a statutory recount as requested.

KAUGER, Justice, concurring specially:

I concur in all parts of the majority opinion, but I write to express the following views.

A.

For the reasons expressed by Summers, J. in the concurring in part dissenting in part opinion in *Henderson v. Maley*, 806 P.2d 626 (Okla.1991), in which I joined, I believe that a recount should be granted. However, the question of a recount is not before us—even if it were—a recount would be unavailable under the majority's teaching in *Henderson*.

B.

It should also be noted that even if we applied what the majority opinion refers to as the "dicta" in *Keltch v. Alfalfa County Election Bd.*, 737 P.2d 908, 910 (Okla.1987), we would not reach a different result.[1]

---

1. In *Keltch v. Alfalfa County Election Bd.*, 737 P.2d 908, 910 (Okla.1987), we stated:
   "In the absence of evidence that more votes were *cast* than there were supporting sugnatures on the poll books, the petitioner's argument that four votes should be discounted, thus voiding the results of the election, is not persuasive." (Emphasis in text.)
   Here, it was asserted that 66 more votes were cast than there were signatures on the poll

### · C.

I agree with many of the public policy pronouncements concerning the duty of election officials expressed by Chief Justice Opala in his dissent, and I am committed to the sanctity of a free and fair election process. However, I cannot agree with his premise that we can transmogrify alleged irregularities—(which do not change the outcome of the election)—into fraud or dishonesty by election officials when neither allegations nor evidence of fraud, corruption or dishonesty have been put forward.

### OPALA, Chief Justice, dissenting.

In today's opinion the court pronounces that whenever it is impossible to determine the outcome of an election with mathematical accuracy[1] a new election must be ordered. Viewing the proof adduced below as insufficient to conclude that the outcome of the judicial race here in contest is incapable of ascertainment with mathematical certainty, the court pronounces that Smith, the losing candidate, is not entitled to a new election. While the court declines today to address Smith's recount quest, pressed by him below but not reasserted before us,[2] it notes that under state law[3] a recount may *not* be conducted if the ballots have not been properly preserved.

For the purpose of my writing I assume—and accept without critical re-examination—that (a) the court's opinion in a companion case, *Henderson v. Maley*,[4] in which I stand recused, correctly denies a losing candidate's recount quest because the ballots were not properly preserved and (b) had Smith pressed his claim for review of the recount's denial, he would not have been successful. It is neither my intention nor desire to affect the court's resolution of that issue—one which is reached for decision in the other case.

I cannot accede to the view that the relief of another election, afforded Smith below, should be set aside in this proceeding. Compelling legal reasons clearly militate against disturbing that decision. If, as in this case, (1) a *timely and legally sufficient recount claim is pressed*, (2) which is *coupled with an alternative plea for another election*, and (3) *a recount cannot be had because of the government officials' failure to preserve the ballots* in conformity to the statutory requirements, the mere impossibility of having a recount becomes the functional equivalent of an inconclusive tally, so that the outcome of the contest is one that may not be determined with mathematical certainty. This event alone triggers the petitioner's state-created due process rights which compel

---

book. The petitioner won the election by a margin of 157 votes. Eighty-seven of the votes were discarded because they were not cast by registered voters. Two votes were discarded because a voter cast a ballot twice. If the 66 ballots were discarded, the petitioner would still win by 2 votes.

1. The terms of 26 O.S.Supp.1990 § 8–120(2) provide:

"When a petition alleging irregularities other than fraud is filed, said petition must allege a sufficient number of irregularities and of such nature as to:

   *    *    *    *    *    *

2. Prove that it is impossible to determine with *mathematical certainty* which candidate is entitled to be certified as the party's nominee or to be issued a certificate of election, or to have his name appear on the Runoff Primary Election ballot.* * *" (Emphasis added.)

2. Had Smith pressed his recount claim in this proceeding, the issue to be decided would have

been whether he was correctly denied a recount for the government officials' failure to preserve the ballots in conformity to the statutory requirements.

3. The court cites 26 O.S.1981 § 8–112 and *Andrews v. State ex rel. Eskew*, Okl., 618 P.2d 398, 400–401 [1980]. The terms of § 8–112 provide in part:

" * * * The recount shall be conducted in the courtroom of the district court in the county or counties for which the recount is requested, and it shall be the duty of a judge of said court ... to attend ... and conduct such recount. It shall be the exclusive and sole duty of said judge to hear evidence as to whether the ballots *have been preserved in the manner* and by the officers *prescribed by law* .... The judgment of said court upon such questions shall be final and conclusive. *If the court cannot determine that the ballots have been properly preserved, then no recount shall be conducted....*" (Emphasis added.)

4. Okl., 806 P.2d 626 [1991].

the granting of another election. The government's failure to account for the *honesty of its initial count* is a significant post-election irregularity which makes the outcome of the race incapable of being determined with mathematical accuracy and hence warrants another election.

I

### THE CANDIDATE'S CONSTITUTIONAL CLAIM TO A FREE ELECTION AND A FAIR COUNT OF THE VOTES ON A TIMELY AND LEGALLY SUFFICIENT RECOUNT PETITION

The election process is a function of the Executive Department. It has both administrative and adjudicative components. The conduct of an election,[5] including the tallying of the vote and the secure preservation of the ballots,[6] may be characterized as purely executive. The recount is a two-step process. The first stage—a determination whether the ballots had been properly preserved—is judge-supervised;[7] the actual recount after a proper showing has been made is purely ministerial.[8] Challenges based on fraud or irregularity call for application of adjudicative process.[9] When a recount is denied for the government's failure to preserve the ballots in conformity to the statutory requirements,

extant case law, which I deem constitutionally flawed, holds that the *executive decision* supplying the tally *becomes final* even though it *escaped the judicial scrutiny* to which it would have been subjected if recount had been possible.[10]

I would condemn as *constitutionally infirm* any notion that lingers in both our statutory and case law which would allow the state to so control the election process that, by its own act of dereliction, it could cause the recount to be withheld and to thus force its executive tally to prevail against the announced loser. This kind of arbitrary state action is plainly violative of due process. It serves as a blueprint for inviting corruption in the conduct of elections. I cannot countenance a norm of law that provides the government with an escape hatch that readily places its officials and their conduct of election beyond the legislatively designed parameters of judicial supervision.[11]

#### A. State–Created Rights and Their Protection By Federal and State Due Process Clauses

States create rights by their *common law, constitution or legislative law.*[12] Once those rights stand created, federal and state due process clauses [13] surround

5. 26 O.S.1981 §§ 7–101 et seq.

6. See 26 O.S.1981 §§ 7–133, 7–134, 7–135, 7–137 for the general statutory scheme for securing the ballots after the polls have closed.

7. See *supra* note 3 for the pertinent provisions of 26 O.S.1981 § 8–112.

8. The pertinent terms of 26 O.S.1981 § 8–112 provide:
   " * * * If the judgment of the court is that the ballots have been properly preserved, then the *recount of the ballots shall be conducted* immediately thereafter *under the exclusive supervision of the county election board."* (Emphasis added.)

9. 26 O.S.Supp.1983 § 8–118; 26 O.S.1981 §§ 8–119, 8–121, 8–122; 26 O.S.Supp.1990 § 8–120.

10. *Andrews v. State ex rel. Eskew, supra* note 3 at 400–401.

11. I have long held the view that the judicial service must guard vigilantly against government lawlessness in the nonperformance of a

clear statutory duty. See my separate opinion in *Matter of Braddy,* Okl., 611 P.2d 235, 238 [1980] (Opala, J., concurring in result), a license revocation case in which the licensee complained of the government's failure to furnish a statutorily mandated transcript of the prior administrative hearing.

12. In *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 [1985], the Court notes that "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'", quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 [1972]; see also *Phillips v. Williams,* Okl., 608 P.2d 1131, 1133 [1980], *cert.denied subnom.,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 [1980].

13. The federal and state constitutions protect against state government deprivation of life, liberty and property without due process of law. 14th Amend., U.S. Const.; Art. 2, § 7, Okl. Const.

them with due process protections against arbitrary action of government.[14] Oklahoma election laws plainly create a right to a recount of the ballots for *any candidate* who has initiated a timely and sufficient quest for that relief.[15] *Due process plainly affords the election loser an opportunity to make the government prove the honesty of its count.* When a timely and legally sufficient recount claim is prevented or thwarted by misfeasance or nonfeasance of the election officials—intentional or unintentional—due process stands denied. The mere impossibility of a requested recount triggers the due process protections when the government is unable to give an account of its election conduct by proof that the outcome is supported by the ballots that were validly cast.

Moreover, while election conduct is not subject to the Administrative Procedures Act [APA],[16] those portions of the APA which embrace due process concepts are binding on agencies exempt from its provisions. *Cf. Braun & Co. v. Corporation Commission;*[17] *Harry R. Carlile Trust v. Cotton Petroleum;*[18] *Amoco Production v. Corp. Com'n of Okl.*[19] The APA embodies some *minimum norms of federal and state due process which govern review of agency decisions:* [a] § 318(1) provides for judicial review of agency action; [b] § 321 confines review to the record; [c] § 320 requires the agency to transmit the entire record to the reviewing court unless shortened by stipulation of the parties; [d] § 309(e) lists items to be included in the record, such as "evidence received or considered". If the record is inadequate (or nonexistent) for proper disposition of the issues on appeal, the APA affords a *method for supplying the needed record* by ordering a new proceeding.[20] These minimum standards of due process divinable from *Braun, Carlile* and *Amoco* apply to court-supervised review in a recount proceeding. When a recount is sought but judicial scrutiny of the agency decision (i.e. the tally) must be withheld for want *of* a record (in the form of ballots securely preserved by the responsible agency officials), due process demands that *a new election be ordered.*

B. *The Candidate's Claim to a Fair Count of the Votes under the State Constitution's "Free and Equal" Election Provisions*

Within the meaning of the state constitution's "free and equal" election provisions,[21] every qualified voter has the right

---

**14.** *Cleveland Bd. of Educ. v. Loudermill, supra* note 12, 470 U.S. at 541, 105 S.Ct. at 1493; *Phillips v. Williams, supra* note 12 at 1133.

**15.** The terms of 26 O.S.Supp.1989 § 8–109 provide in part:

"*Any candidate* whose name appeared on a Primary, Runoff or General Election ballot, or any individual *authorized to request a recount* pursuant to Section 8–111 of this title *may,* any time before 5:00 p.m. Friday next following an election, *contest the correctness of the announced results of said election by filing a written petition* with the appropriate election board...." (Emphasis mine.)

The pertinent provisions of 26 O.S.Supp.1989 § 8–111(A) are:

"A. In the event *a candidate requests a recount* of the ballots cast in an election, he must set forth in his petition the precincts and absentee ballots which he desires to be recounted.... When such petition is properly filed, *it shall be the duty of the secretary of the* appropriate *election board to order said recount ...."* (Emphasis added.)

**16.** The pertinent terms of 75 O.S.Supp.1987 § 250.5 (renumbered from 75 O.S.1981 § 324 by Okl.Sess.L.1987, C. 207, § 27) provide:

"This *act shall not apply to* municipalities, *counties,* school districts, and *other agencies of local government;* nor to specialized agencies, authorities, and entities created by the legislature, performing essentially local functions...." (Emphasis mine.)

**17.** Okl. 609 P.2d 1268, 1273 [1980].

**18.** Okl., 732 P.2d 438, 442–443 n. 21 [1986].

**19.** Okl.App., 751 P.2d 203, 207 [1988].

**20.** 75 O.S.1981 § 322(2). *See also, Carbone v. Weehawken Tp. Planning Bd.,* 175 N.J.Super. 584, 421 A.2d 144, 145 [L.1980]; *Fahrenbruck v. State Bd. of Landscape Architect Ex.,* 13 Ohio Misc. 39, 230 N.E.2d 691, 691 [Ct.Com.Pl.1967]; *Colaw v. University Civil Service Merit Board, Etc.,* 37 Ill.App.3d 857, 341 N.E.2d 719, 722 [1975].

**21.** The terms of Art. 2, § 4, Okl. Const., provide: "No power, civil or military, shall ever interfere to prevent *the free exercise of the right of*

to cast a vote *and to have that vote fairly counted.*[22] This "free ballot and a fair count" principle[23] is a well-established tenet of American election law.[24] A fair count is one that is capable of going through a loser's requested reinspection of government evidence. That proof consists of the preserved ballots. If the election loser cannot test the accuracy of the government count by the statutorily prescribed method, the count becomes incapable of audit and confirmation. A legal cloud is thus *ipso facto* cast on the mathematical accuracy of the outcome, which is sufficient to overcome the *prima facie* presumption of the correctness[25] that was initially attachable to the official returns.

## II

### A CANDIDATE IS ENTITLED TO ANOTHER ELECTION WHENEVER HIS OR HER TIMELY AND LEGALLY SUFFICIENT RECOUNT CLAIM, COUPLED WITH AN ALTERNATIVE QUEST FOR ANOTHER ELECTION, MUST BE DENIED FOR THE GOVERNMENT'S FAILURE SECURELY TO PRESERVE THE BALLOTS

Oklahoma statutory law gives one who *timely* seeks a recount, *pays the money* and otherwise has a *legally sufficient claim*, a due process protected quest to a fair count. I would hence hold that a valid recount claim, when coupled with an alternative quest for another election, cannot be denied when recount is impossible for an inexcusable fault on the part of the election officials who failed properly to preserve

*suffrage* by those entitled to such right." (Emphasis added.)
The pertinent terms of Art. 3, § 5, Okl. Const., are:
"All elections shall be *free and equal.* No power, civil or military, shall ever interfere to prevent *the free exercise* of the right of suffrage...." (Emphasis added.)

**22.** We have stated on several occasions that the right of a qualified elector to vote *and have that vote counted* is basic and fundamental. See *McCarthy v. Slater,* Okl, 553 P.2d 489, 490 [1976]; *Sparks v. State Election Board,* Okl., 392 P.2d 711, syllabus 1 [1964]. The "free and equal" language is contained in the constitutions of several states. See e.g., Art. 1, § 5, Pa. Const.; Art. 2, § 1, Ind. Const.; Ky. Const. § 6; see also Williams, The Constitution and Enabling Act of the State of Oklahoma 26 [1912].

**23.** In Goldman, A Free Ballot And A Fair Count [Ph.D. dissertation, Michigan State University, 1976], the author discusses the constitutional and political framework leading to the federally evolved protection of the *"free election and a fair count"*. He notes that *Ex parte Yarbrough,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 [1883], "represented the judicial acceptance of the political concept of the 'free ballot and a fair count.'" *Id.* 4 S.Ct. at 169.

**24.** See e.g., *Asher v. Arnett,* 280 Ky. 347, 132 S.W.2d 772, 775–776 [1939], and *Queenan v. Russell,* 339 S.W.2d 475, 477 [Ky.App.1960], where the court construed the "free and equal" election provisions of the state constitution to mean that an election is free and equal when "each voter under the law has the right to cast his ballot and *have it honestly counted."* (Em-

phasis mine.) *See also* Goldman, *supra* note 23, which gives a detailed account of the efforts of federal government officials in the South to protect the "free ballot and a fair count," citing *United States v. Reese,* 92 U.S. 214, 23 L.Ed. 563 [1875], and *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 [1875], as examples of early judicial support for national authority over the electoral process. The author focuses on the early attempts of the federal government to enforce Fifteenth Amendment rights—i.e., the exemption from discrimination in the exercise of the elective franchise on grounds of race, color or previous condition of servitude—through prosecutions brought under federal statutes.

**25.** The terms of 26 O.S.1981 § 7–136 provide in part:
"The county election board shall convene ... for the purpose of receiving the official precinct returns and ... shall cause to be listed the results of such election. Such county [precinct election] returns shall be *prima facie evidence of the correctness of the result* in the several counties. The State Election Board shall use such county returns to certify the results of such election for all state officers...." (Emphasis added.)
In *Looney v. County Election Board,* 145 Okl. 25, 291 P. 554, 564 [1930], the court held that absent a showing that the ballots had been securely preserved according to law, the official returns prepared by the precinct officials were *prima facie* evidence of the correctness of the precinct vote and the results were conclusive in the absence of a verified petition challenging the correctness of the announced results. See also *Andrews v. State ex rel. Eskew,* supra note 3.

the ballots. Another election is then a *sine qua non.*

The denial of a recount request for failure of the officials to preserve securely the ballots is analogous to a timely appeal in which the government, through no fault of the appellant, makes it impossible to provide an appellate record for which no substitute is available, or the content of which may not be supplied from any other sources. When this eventuality occurs, the appealing party is entitled to a new trial under 12 O.S.Supp.1990 § 655.[26] Similarly, if a timely and legally sufficient recount claim must be denied for an inexcusable fault of the election officials, the recount petitioner—who alternatively seeks another election—is at once entitled to a new election contest.

Because a timely and legally sufficient recount quest, when thwarted by the government's failure to preserve securely the ballots, serves in my view to overcome the presumption of the official tally's correctness, I would hold today that the government's failure properly to preserve the ballots for the loser's opportunity to test the accuracy of its count makes that race incapable of being determined with mathematical accuracy.[27] I would hence hold that the relief of another election Smith secured below should not be disturbed.

### III

### THE SMITH CLAIM TO RECOUNT, THOUGH ABANDONED BY FAILURE TO SEEK THE SAME RELIEF IN THIS COURT, DOES NOT PREVENT HIM FROM SECURING THAT RELIEF TO WHICH HE IS ENTITLED BY THIS COURT'S APPLICATION OF PROPERLY APPLICABLE PUBLIC–LAW NORMS WHICH GOVERN THIS CASE

Smith, who initially sought and was denied a recount, secured another election based on irregularities which made the outcome of the race incapable of mathematical certainty. He neither asks us for a recount nor presses here in support of the favorable decision a different legal theory. While we cannot afford Smith a recount—a relief not sought by him in this court—the public-law character of the controversy[28] leaves us absolutely free to change the legal underpinnings for the decision below to leave the result undisturbed in this proceeding.[29]

I would hence let Smith benefit from another election, as ordered below, and rest my decision on the government's inexcusable fault in preventing a recount.

---

**26.** The terms of 12 O.S.1981 § 651(9) and 12 O.S.Supp.1990 § 655 provide a mechanism a party may invoke to secure a retrial where, through no fault of his or hers, an appellate record cannot be secured. *Matter of Estate of Burkhart v. Wabaunsee,* Okl., 594 P.2d 361, 362–363 [1979]. A complaining party was afforded a new trial under these statutes when (a) the court reporter's shorthand notes had been lost, making it impossible to transcribe the evidence, *J.H. Taylor Trust v. Driggs,* 193 Okl. 346, 143 P.2d 806 [1944]; (b) the court reporter's impaired eyesight made it impossible to complete the appellate record in time for appeal, *Harris v. First Nat. Bank,* 140 Okl. 269, 282 P. 1097 [1929]; (c) the court reporter's notes had been destroyed by a courthouse flood, *Gibson v. City of Chickasha,* 171 Okl. 284, 43 P.2d 95, 96 [1935]; (d) the court reporter died before transcribing the testimony necessary to produce a substantially complete record, *City of Duncan v. Abrams,* 171 Okl. 619, 43 P.2d 720, 723 [1935]; (e) the court reporter either failed, refused or was unable to make a transcript of the evidence,

*Cherry v. Brown,* 79 Okl. 215, 192 P. 227 [1920]; and (f) the judge's death prevented settlement of the appellate record, *In re James' Will,* 64 Okl. 70, 166 P. 131 [1917]; *J.W. Ripey & Son v. Art Wall Paper Mill,* 27 Okl. 600, 112 P. 1119 [1910].

**27.** 26 O.S.Supp.1990 § 8–120(2), *supra* note 1.

**28.** The election process is clearly a matter of great public interest. Art. 2, § 4, Okl. Const., *supra* note 21; see also *Keltch v. Alfalfa County Election Bd.,* Okl., 737 P.2d 908, 909 [1987].

**29.** Public-law issues may be resolved in this court upon a theory not presented to the trial court. *Burdick v. Independent School Dist.,* Okl, 702 P.2d 48, 54 [1985]; *McCracken v. City of Lawton,* Okl., 648 P.2d 18, 21 n. 11 [1982]; *Application of Goodwin,* Okl., 597 P.2d 762, 764 [1979]; *First National Bank v. Southland Production Co.,* 189 Okl. 9, 112 P.2d 1087 [1941]; *Special Indemnity Fund v. Reynolds,* 199 Okl. 570, 188 P.2d 841 [1948].